UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALFADELLA WILLIAMS,

               Plaintiff,

               08-CV-6063

      v.

CITY OF ROCHESTER,           **DECISION and ORDER**

               Defendant.
_____

## **INTRODUCTION**

Plaintiff Alfadella Williams ("plaintiff") brought this action alleging racial harassment, retaliation, and a hostile work environment against the City of Rochester ("defendant") for violations of 42 U.S.C. § 1981, Title VII, and the New York Human Rights ("NYHRL"). Specifically, plaintiff asserts that defendant assigned overtime in a discriminatory fashion, allowed another employee to set her own hours while denying this privilege to her, and required plaintiff to perform more work than other employees. Plaintiff claims these circumstances created a hostile work environment. Plaintiff also alleges retaliatory treatment by defendant after she filed her grievance regarding the alleged discrimination. Defendant moves for summary judgment arguing that there is no evidence of racial animus, hostile work environment, or retaliation. Because there is no genuine issue of material fact, I grant defendant's motion for summary judgment it its entirety.

## **BACKGROUND**

Plaintiff began working for defendant in 1980. For the

relevant period, plaintiff worked for defendant in a position entitled "Clerk II" in the Bureau of Accounting ("Accounting") in the Accounts Payable unit within the Department of Finance ("Finance"). Plaintiff's responsibilities included processing claim vouchers along with processing and filing unit contracts. Plaintiff would review an invoice and compare it to the contract in order to make sure vendors and contractors were charging defendant the agreed upon amount. This process required several other persons designated as "Clerk IIs" in Accounting. From 1999 to 2006, plaintiff worked along with Hazel Thompson ("Thompson") and Mabel Thayer ("Thayer") and their immediate supervisor was Randy Webb ("Webb"). Webb's title was that of Senior Accountant and he held a supervisory role over all of the Clerk IIs. While plaintiff acknowledges that she was unsure of Webb's complete duties, during his absence, plaintiff would perform certain duties that normally were performed by Webb such as contracts for construction and personal services. Webb was supervised by Assistant Director of Accounting James Hafner ("Hafner") and Director of Accounting James Barclay ("Barclay"). Vincent Carfagna ("Carfagna") served as the Director of Finance for the relevant periods to this litigation. In late 2006, Raymond Gosswirth ("Gosswirth") replaced Webb as plaintiff's supervisor. Thayer and Thompson eventually left and were replaced by Elizabeth Rivera ("Rivera") and Debbie Brongo ("Brongo") as Clerk IIs. Hafner has since been replaced by

2

Assistant Director Havens.

Plaintiff, a union member, filed a grievance in February 2006 alleging that Webb manipulated responsibilities in Accounting in order to give himself overtime instead of equally distributing it to other Clerk IIs. Plaintiff alleged that Webb would deliberately take clerical work for himself and complete it after 5 p.m. thereby allowing him to collect overtime. Hafner, as Webb's direct supervisor, authorized this overtime by signing Webb's time sheet. At a meeting regarding this grievance, plaintiff admitted that some of the overtime work performed by Webb consisted of duties not assigned to her. Plaintiff's union withdrew the grievance.

In addition, plaintiff who is African-American, maintains that Webb discriminatorily withheld overtime on the basis of plaintiff's race. It should be noted that Thompson, one of the other Clerk IIs, is also African American. Thayer and Brongo, the other Clerk IIs, are Caucasian and Rivera, the remaining Clerk II is Hispanic. Further, none of the other Clerk IIs regularly received or were offered overtime during the relevant period. Plaintiff also maintains that Webb and others singled her out for disparate treatment by requiring her to "cross train" for other duties, including Webb's. This "cross training" was not a formal aspect of plaintiff's job. Rather it appears that in 2005 and 2006 two Clerk IIs (Thompson and Thayer) retired, causing an increased workload for plaintiff. Webb began training the two new hires, Brongo and

Rivera to bring them up to speed, while plaintiff had to keep up with increased responsibility since she was the most experienced Clerk II at that time. Plaintiff further alleges that she was required to take the workload of absent employees while her workload accumulated. In addition, plaintiff alleges that Rivera, who is Hispanic, was allowed to work a flexible schedule. Plaintiff also alleges that other non-African-American employees were allowed to use the internet excessively without punishment. All of the above allegedly created a hostile work environment and subjected plaintiff to racial harassment.

After plaintiff filed her first grievance, Webb stopped greeting plaintiff in the morning. He purposely wore headphones at his desk in order to shut out plaintiff. Webb, upon returning from a vacation and at Christmas, gave gifts to all the clerks except plaintiff. Plaintiff filed a second grievance in July 2006 based on Webb's actions. In this grievance, plaintiff asserted that the basis of Webb's actions was racial discrimination. Director of Accounting Barclay responded in a memorandum to Director Carfagna that Webb has no history of racially discriminatory behavior. Further, Barclay explained that plaintiff's workload primarily consists of low-priority work that can accumulate for a few days without causing a problem. Barclay discussed how Webb accommodated Rivera's child-care needs by allowing her a flexible schedule. Barclay noted this practice violated the union contract and Webb

4

was notified to stop. Finally, Director Barclay explained how Webb was training two new clerks.

Plaintiff's first grievance details several meetings and discussions regarding the overtime issue. After her first grievance, Hafner offered to have Louis Cotraccia ("Cotraccia"), a Senior Accountant, help plaintiff with her workload. Cortraccia helped plaintiff several times with her increased workload. Plaintiff discussed with Hafner that her complaint was not that she had too much work, but rather that Webb manipulated the system to enrich himself. Hafner responded that he needed time to address the issue. The next week plaintiff had a meeting with Director Carfagna and he indicated his awareness of plaintiff's complaint. Carfagna informed plaintiff that he believed that overtime should be distributed equally and by seniority, but he also stated that Webb's slower pace of work could not by itself form the basis of a complaint. Further, Carfagna told Hafner to offer plaintiff and other Clerk IIs three hours of overtime for the remainder of the week. Notably, plaintiff rejected this offer, responding that she was "very capable of doing two functions at the same time and there would in all probability be no need for overtime." See Plaintiff's Ex. U, p. 7. Plaintiff alleges that she saw Webb continue to work past 5 p.m., collecting overtime.

Plaintiff currently holds the same position as a Clerk II in Accounting. Significantly, plaintiff has never been denied a salary

5

increase and was never disciplined by Webb or her other supervisors. Plaintiff asserts claims against the defendant pursuant to § 1981, Title VII, and the New York State Human Rights Law for subjecting her to racial harassment, retaliation and creating a hostile work environment. Defendant moves for summary judgment, asserting that there is no genuine issue of material fact. For the reasons set forth below, I grant defendant's summary judgment motion in its entirety.

## DISCUSSION

### I. Defendant's Motion for Summary Judgment

A party is entitled to summary judgment if it can demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Once the movant has " 'show[n]' " or "point[ed] out ... that there is an absence of evidence to support the nonmovant['s] case," the burden shifts to the nonmovant. See Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). To discharge this burden, "a plaintiff must come forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. See

Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir.2001).

The court must draw all factual inferences in favor of the party against whom summary judgment is sought and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmovant. See Anderson, 477 U.S. at 255; Celotex Corp., 477 U.S. at 322. However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776 (2007). The law is well established that "conclusory statements, conjecture, or speculation" are insufficient to defeat a motion for summary judgment. See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir.1996). The nonmovant cannot survive summary judgment simply by proffering "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), or presenting evidence that "is merely colorable, or is not significantly probative." See Savino v. City of New York, 331 F.3d 63, 71 (2d Cir.2003) (quoting Anderson, 477 U.S. at 249-50, (citation omitted)). Rather, he must "set out specific facts showing a genuine issue for trial." See Fed.R.Civ.P. 56(e)(2); see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998) ("non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of...events is not wholly fanciful."

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir. 1996). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969). Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial. Id.

## II. 42 U.S.C. § 1981

In Plaintiff's First and Second causes of action, she asserts violations of § 1981 due to defendant subjecting her to racial harassment and retaliatory treatment. Under § 1981 or § 1983, a municipality cannot be vicariously liable for the acts of its employees. See Monell v. N.Y. City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978); Amnesty Am. v. Town of W. Hartford 361 F.3d 113, 128 (2d Cir. 2004). The alleged wrongdoing must arise from "policies or customs" of the municipality. Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006).

The policy or custom may be shown in a number of ways. In this case, plaintiff contends policymakers for the defendant were

8

"deliberately indifferent" to her supervisor's unconstitutional actions, essentially making a conscious choice to adopt Webb's unconstitutional acts as its own policy. Plaintiff is correct that "deliberate indifference" can form the basis of liability.[1] See City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989). However, "[o]nly where a municipality's failure to train [or supervise] its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983." Id.

"Thus, plaintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was "obvious," and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." Amnesty Am., 361 F.3d at 128 (internal citation omitted). Plaintiff essentially claims that defendant's failure to supervise the accounting office shows a deliberate indifference to the constitutional torts committed by Webb and Hafner.

---

[1] The typical "deliberate indifference" case involves police departments and law enforcement agencies generally. See, e.g., Davis v. Stratton, 2010 WL 76289 (2d Cir. 2010); Missel v. County of Monroe, 2009 WL 3617787 (2d Cir. 2009). Amnesty Am., relied upon by plaintiff, involved a policymaker who personally witnessed and encouraged violent beatings by police officers under his supervision. See Amnesty Am., 361 F.3d at 127-131. The Second Circuit stressed how blatant constitutional violations and the encouragement by the policymaker could create municipal liability. Id. Amnesty Am. is hardly analogous to this case where the violation, racial harassment, is not apparent and the defendant acted to stop any alleged misconduct.

First, assuming arguendo that Carfagna and Barclay were policymakers, their actions could hardly show "deliberate indifference" to flagrant unconstitutional conduct. Plaintiff does not dispute that at no time did Webb outwardly display any racial animus. See Williams Tr. 51:19-20. Second, correspondence between Carfagna and Barclay show they directed all employees to refrain from using headphones. See Plaintiff's Ex. E. It also shows that policymakers instructed supervisors to cease allowing flex-time. See Plaintiff's Ex. E. Further, plaintiff's own grievance discusses how management offered every employee three hours of overtime as a result of her complaints. See Plaintiff's Ex. U. Plaintiff's own grievance notes indicate that Hafner became concerned about plaintiff's increasing workload, offering assistance if plaintiff needed it. However, plaintiff refused these requests for relief. See id. These types of actions hardly show "deliberate indifference" by defendant based on the case law. Accordingly, I therefore grant defendant summary judgment regarding plaintiff's §1981 claims.

### III. Hostile Work Environment Claims

Plaintiff's Third and Fourth causes of action assert that defendant's racial discrimination created a hostile work environment (collectively "hostile work environment claims").[2] "A

---

[2] The principles governing discrimination claims under Title VII and the NYSHRL are virtually identical, and as such these claims are evaluated using the same analytical framework. See Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597 (2d Cir. 2006); see also Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001); Ferrante

hostile work environment, in violation of Title VII, is established by a plaintiff showing that his or her workplace was 'permeated with "discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" McCowan v. HSBC Bank, USA, N.A. , 2010 WL 550235, 22 (E.D.N.Y. 2010) (quoting Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, (1993))). The conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (citation and quotation omitted). A plaintiff must provide some "linkage" of the alleged misconduct to her membership in a protected class. See Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.").

Isolated, minor incidents alone cannot create the hostile work environment. "[A] plaintiff must still prove that the incidents were "sufficiently continuous and concerted" to be considered pervasive, or that a single episode is "severe enough" to establish a hostile working environment." Id. (quoting Perry v. Ethan Allen,

---

v. American Lung Assoc., 90 N.Y.2d 623, 629 (1997). Accordingly, the discussion in sections III and IV include this court's review of plaintiff's state law claims.

Inc., 115 F.3d 143, 149 (2d Cir. 1997)).

The Court finds that plaintiff cannot meet this burden. Plaintiff does not allege that Webb or any of defendant's agents made racially discriminatory remarks. Deposition testimony, internal correspondence, and plaintiff's grievances provide a litany of facially neutral incidents in Accounting. "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [membership in a protected class]. See Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002). In other words, there must exist a basis for a jury to conclude these incidents were based on race. See id.

Without evidence even hinting a racial animus, defendant is entitled to judgement as a matter of law. Moreover, several of the facially neutral actions appear to be directed not just at plaintiff but at several of the other employees. In addition, plaintiff alleges denial of overtimes benefits, yet admits that she and other Clerk II employees did not regularly work overtime. See Williams Tr. 41:24-25, 42:2-11. Further, since Webb left the accounting department, neither plaintiff nor her co-workers have worked overtime. See Williams Tr. 51:21-25, 52:2-5. Yet, plaintiff's complaint seems to allege that she had an excessive workload that should have justified overtime. Similarly, plaintiff

complains that in her absence her work was unattended while other employees' workloads were attended to in their absence. Defendant does not dispute that plaintiff's duties were allowed to accumulate. However, defendant contends that plaintiff's particular job responsibilities were of low-priority, thus her work could accumulate for a few days without causing a problem. Further, Cotraccia states that he helped plaintiff with her workload from July 2005 to October 2005, and again in January 2006. See Cotraccia Affidavit ¶ 5, 12. When plaintiff was out for six weeks of medical leave, her functions were performed before her return. See Williams Tr. 44:8-14. Absent racial animus, an apparent discrepancy in workload cannot create Title VII liability. See Nakis v. Potter, F. Supp.2d, 2004 WL 2903718, 21 (S.D.N.Y. 2004)("Hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable").

Plaintiff also contends that co-workers were allowed to schedule their own hours. In addition, plaintiff alleges that Rivera, who is Hispanic was allowed to work a "flex" schedule, arriving between 7 a.m. and 8 a.m. and leaving early in the afternoon. Defendant however genuinely believed that Rivera was a single mother and thus allowed her flex time hours.[3] It is significant to note that plaintiff's own testimony reveals that she

---

[3] Plaintiff's disputes Rivera's single mother status.

was also able, upon request, to work a flex schedule on several occasions. See Tr. 47:9-25, 48:2-23. Further, plaintiff alleges that fellow employees were allowed to use the internet with impunity, yet plaintiff does not dispute that she was never reprimanded for using the internet. See Williams Tr. 49:3-7. Nevertheless, such trivial disputes do not afford plaintiff protection under Title VII. Under the totality of the circumstances no trier-of-fact could find defendant created a hostile work environment permeated with racial animus. Accordingly, I grant defendant's motion for summary judgment regarding the hostile work environment claims.

## IV. Retaliation Claims

Plaintiff's Fifth and Sixth causes of action allege defendant retaliated against her by failing to take remedial action in regards to plaintiff's complaint.[4] Claims of retaliation are reviewed under the familiar McDonnell Douglas burden shifting framework. See Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05(1973).

"First, the plaintiff must establish a prima facie case of retaliation by showing: '(1) participation in a protected activity;
    (2) that the defendant knew of the protected activity; (3) an

---

[4]Plaintiff's Sixth cause of action alleges that defendant had "no reason to terminate Plaintiff, a long term employee of defendant Town of Geneva." See Complaint ¶ 68. This is wholly inaccurate. In this case, plaintiff was not terminated and defendant is not the Town of Geneva.

adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Hicks, 593 F.3d at 164 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir.2005). If this burden is met, defendant must articulate a "legitimate, non-retaliatory reason for the adverse employment action." Jute, 420 F.3d at 173. Provided a defendant meets this requirement,"the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." Id.

Defendant disputes that plaintiff engaged in protected activity because plaintiff's union grievances fail to allege discrimination. Contrary to defendant's assertion, plaintiff's grievances complain of discrimination generally and racial discrimination.

The crux of plaintiff's argument is whether she suffered an "adverse employment action," which has a broader meaning in retaliation cases than in cases alleging discrimination. The Supreme Court has held that "materially adverse" actions form the basis of retaliation claims. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (U.S. 2006). In the retaliatory context, materially adverse means actions that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. The Burlington Northern Court maintained, however, that requiring materiality allows courts to separate

trivial harms from those that are significant. Id. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.

The Court finds that based on the undisputed facts, plaintiff's allegations against Webb amount to the type of trivial harms not actionable under Title VII. In plaintiff's own words, Webb essentially gave her the "silent treatment." See Williams Affidavit ¶ 99. Webb allegedly gave gifts to everyone in the office except plaintiff. A "simple lack of good manners" cannot, as a matter of law, dissuade a reasonable person from making a charge of discrimination. See Burlington Northern, 548 U.S. at 68. "Title VII ...does not set forth "a general civility code for the American workplace." Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998).

Plaintiff also alleges that the discriminatory practices that formed the basis of her hostile work environment claims were "ratified" by Carflanga and Barclay in retaliation for the union grievances. The record belies plaintiff's contention. Plaintiff's complaints of unfair overtime distribution led to Hafner offering plaintiff overtime. See Plaintiff's Ex. U. Further, Barclay took steps to stop Webb's allegedly rudeness to plaintiff. See Plaintiff's Ex. Z. Plaintiff seems genuinely concerned about the allocation of overtime and Webb's use of it. There is, however,

nothing in the record to suggest that plaintiff was singled out for disparate treatment as a result of her grievance. The undisputed facts demonstrate that Webb may have given plaintiff the "cold shoulder," but without more that allegation is simply not actionable. In sum, nothing in the record suggests that defendant's actions would dissuade a reasonable person from filing a charge of discrimination. See Burlington Northern, 548 U.S. at 67. I grant defendant's motion for summary judgment regarding the retaliation claims.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's Complaint is dismissed in its entirety with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

                                  s/Michael A. Telesca
                                    MICHAEL A. TELESCA
                           United States District Judge

Dated:    Rochester, New York
            March 17, 2010